1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3    Before The Honorable Nathanael M. Cousins, Magistrate Judge

4

5   VALAME,                        )
                                   )
6          Plaintiff,              )
                                   )
7   vs.                            )   No. C 23-03018-NC
                                   )
8   BIDEN, et al.,                 )
                                   )
9          Defendants.             )
    _____)

10

11                                 San Jose, California
                                   Wednesday, December 13, 2023
12

13   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
            RECORDING 11:21 - 12:33 = 1 HOUR 12 MINUTES
14

    APPEARANCES:
15

    For Plaintiff:
16                                 4039 2nd Sreet
                                   Palo Alto, California 94306
17                          BY:  VIKRAM VALAME, PRO SE

18   For Defendants:
                                   Department of Justice
19                                 Civil Division
                                   1100 L Street NW
20                                 Suite 11406
                                   Washington, DC 20005
21                          BY:  ANDREW J. RISING, ESQ.

22   Transcribed by:               Echo Reporting, Inc.
                                   Contracted Court Reporter/
23                                 Transcriber
                                   echoreporting@yahoo.com
24

25

1

1  <u>Wednesday, December 13, 2023</u>                    <u>11:21 a.m.</u>

2                    P-R-O-C-E-E-D-I-N-G-S

3                         --oOo--

4          THE COURT:  We'll take your appearances here.  One

5  second.

6          THE CLERK:  And calling civil 23-03018, Vikram

7  Valame.  Is that correct?

8          THE COURT:  What's the correct pronunciation?

9          MR. VALAME:  Vikram Valame.

10         THE COURT:  Valame.  Thank you.

11         THE CLERK:  Versus Joseph Biden and others.

12  Counsel -- or will the parties please state your appearances

13  for the record?

14         MR. VALAME:  I'm Vikram Valame representing

15  myself.

16         THE COURT:  Welcome.

17         MR. RISING:  Andrew Rising from the Department of

18  Justice representing the defendants, and my colleague Daniel

19  Lauretano with the Selective Service, also (indiscernible).

20         THE COURT:  Welcome to you both.  Thanks for being

21  here.  And, Mr. Valame, thank you for being here.

22     All right.  We were finishing some other case

23  management conferences on the phone.  That's why we started

24  a little late.  Thanks for your patience.

25     For logistics for the hearing, if you'll please do

2

1  speak into a microphone because we are making a recording of

2  what's being said, both what you say and what I say.  And if

3  any party wishes to request a transcript from the hearing --

4  you're not required to.  But if you seek a transcript, that

5  transcript will come from the recording.  So it's important

6  that we have a good recording of what's said and not overlap

7  with each other to the extent possible to aid in the

8  creation of a good record.

9       And if at any point you can't hear me, also important,

10 tell me to repeat myself or slow down so that you can hear

11 what my questions or comments might be.

12      The two motions before the Court are plaintiff's motion

13 for partial summary judgment on claims one through three.

14 That's at docket 30.  And the defendants' motion to dismiss

15 or, in the alternative, motion for a summary judgment,

16 that's at docket 38.

17      And there's a small detail which I'll get into, but not

18 first, about if I were to grant defendants' motion.  I think

19 -- I believe that you'll tell me more about it.  There's

20 still an individual claim against Defendant Kett, K-E-T-T,

21 that is not subject to the motion.  But that's a detail we

22 can get to.

23      So those are the issues presented to the Court today.

24 All parties have consented to the jurisdiction of magistrate

25 judge.  So we have that jurisdictional threshold resolved.

3

1  But there is an important jurisdictional issue I want to ask
2  you about first, and that's standing.  Both parties
3  referenced standing in your briefs.  But even if you hadn't
4  mentioned standing in your briefs, the Court has an
5  independent duty and has to be satisfied that there's a case
6  or controversy and that Article III standing, which has both
7  a constitutional component and also prudential
8  considerations, that not only is there an injury that's
9  occurred -- that there's a violation that's occurred out
10 there in the world, but that the plaintiff is the right
11 person or -- and you are a person in this case -- sometimes
12 there's an entity.  But you're the right person to bring the
13 claim that there's been an injury, but that that injury is
14 concrete and particularized, that there's an injury in fact
15 that has occurred, that there's causation, that the injury
16 was caused by the defendant's conduct or omissions, that
17 there's redressability, there's a likelihood that the injury
18 that is asserted by the plaintiff will be redressed by the
19 lawsuit.  And then there's some additional prudential
20 considerations all going to the idea that the Court does not
21 rule on generalized grievances.  There has to be a real case
22 or controversy in order for the Court to take on a case,
23 because the alternative is that there could be lots of
24 theoretical arguments or abstract arguments between parties
25 that maybe aren't even -- that may not be the right time or

4

1  the right person or the right Court.  Doesn't mean that

2  there's not a way to redress the problem.  The question is,

3  is the federal court the right court at the right time to

4  address a harm that is raised in a lawsuit?

5      So I want to talk about that more first, because if the

6  Court lacks -- if the plaintiff -- and the plaintiff is the

7  one who comes to Court -- has the burden to establish

8  standing to sue, if I'm not satisfied that there's standing

9  to sue and I have jurisdiction to hear this case, then I

10 won't reach all -- to any other arguments that the parties

11 have raised in their briefs.  At least I won't raise them --

12 I won't decide them until I'm satisfied that there is

13 standing to sue.

14     And I'm going to talk a little more.  Overlapping with

15 that question of standing is -- and this goes to, I believe,

16 the redressability and prudential concerns that are part of

17 the standing analysis is a political question doctrine which

18 overlaps with some jurisdictional issues of -- even, Mr.

19 Valame, if there's a constitutional problem or an

20 administrative procedure problem, a question presented is,

21 is the court the right place to grant the remedy you seek,

22 or is it somewhere different?  And there's a number of cases

23 in different contexts, not just about the Selective Service,

24 but in different contexts where Courts have found, well --

25 even if I were to concede -- and I'm not conceding anything,

5

1  but even if I were to say I think there's a constitutional

2  violation or a violation of the Administrative Procedures

3  Act, in some circumstances, the Court has said, well, that

4  is a problem that is redressable with the political

5  branches, with the legislature, either the federal

6  legislature or a state legislature, or both, or with the

7  executive branch.  It's something that should be addressed

8  by the executive branch.  You can go talk to the executive

9  branch directly.  They might give you relief.  But for some

10  types of controversies, the Court says we're not going to --

11  for some of these prudential concerns and redressability

12  concerns, we're not -- even if I were to agree that there's

13  a problem and that you're the right person who has the

14  problem and the problem is now, we're not going to grant a

15  remedy in this situation, other than to say you should take

16  your concerns to the executive branch or you should take

17  your concerns to the legislative branch, that they're in a

18  position to do something about it.  And maybe after you've

19  talked further with them to address your concerns, maybe

20  then would be the right time to come back to the Court and

21  ask the Court to do something about it, that either, "No,

22  I'm not going to do something about it," or, "The time is

23  not right now until there has been a further effort through

24  direct lobbying and addressing your concerns to those other

25  branches of government before the Court is going to wade

6

1  into it."

2       So that's a lot of lead-in to this.  But you have very

3  thoughtfully already presented me many arguments on both

4  sides on the issues of -- that are in your motions, the

5  claims that are in your case, Mr. Valame, and the defenses

6  that the government has raised.

7       But I do want to start with standing to see if there is

8  a case or controversy here that I have power to rule on.

9       So, Mr. Valame, I want to address this to you.  First

10 thing, you're self-represented, although you've been

11 extremely thorough in your papers.  If you do have any

12 questions for me procedurally, I want to answer them so that

13 you're not being taken advantage of in any way in this case.

14 And we also have a pro se help desk attorney, Haohao Song,

15 on the second floor.  And I think we've given you his phone

16 number, but I wanted to see -- start by asking you, do you

17 have any procedural questions for me about what we're doing

18 today or in the case that I can answer for you?

19           MR. VALAME:  Sure.  Two things.  First of all, I

20 talked to the pro se help desk.  They said they wouldn't

21 represent me because they don't allow claims against the

22 federal government at that help desk.  That's what I was

23 told when I talked to two employees at the court.  So --

24           THE COURT:  And there's -- I'm going to respond

25 not by disagreeing, but just to understand more what you

7

1    were told.  There is representation, and I understand that

2    the -- and I'm not speaking about representation of somebody

3    being an attorney for you, but just giving you advice

4    procedurally about what to do.  Did you speak with Mr. Song?

5            MR. VALAME:  I called -- there's a pro se help

6    desk number on the court's website.

7            THE COURT:  Yes.

8            MR. VALAME:  I called that.  I explained my case

9    to the person on the other line, and they said that they

10   didn't offer help for my kind of case against the federal

11   government.  And then when I filed my case, I talked with

12   the clerk at the desk, and she said, yeah, that that office

13   doesn't represent claims against the federal government.  So

14   that's -- not represent, but give advice even.

15       Secondly, if -- so you brought up standing.

16           THE COURT:  Yes.

17           MR. VALAME:  I guess I would respectfully ask that

18   if you're going to rule on standing or have serious

19   concerns, I have an opportunity to file something extra on

20   the issue because -- I guess, like, notice considerations,

21   and I didn't raise it in my second brief because the

22   government didn't make any arguments.

23           THE COURT:  Yeah.

24           MR. VALAME:  And I understand that you cannot

25   waive standing, but --

8

1        THE COURT:  You're right.  So let me respond to
2   those things.  You're right.  You can't waive standing.  I'm
3   raising it independently.  Even if they made no mention of
4   it and you made no mention of it, I would still raise the
5   issue because it's still your burden to establish.  And,
6   yes, for purposes of due process and notice, and to have a
7   full record, I would absolutely give you an opportunity to
8   respond in writing after we have this conversation today and
9   before I rule, and we can talk about how much time you need
10  and what you have in mind.  And the defendants too might
11  have something that they want to say about standing, and
12  they can tell me today.  And if they wish to, they can give
13  me something in writing, and we can talk about that.  So,
14  absolutely.
15       And I want to -- I'll look into this question about
16  whether they can help you or not at the help desk because of
17  the nature of your claims before I comment further on that.
18  But I'm glad that you at least have the number and have
19  responded so far.
20       So any other procedural questions?
21        MR. VALAME:  Like, on standing, I guess -- again,
22  this is more in the actual argument, but I think that I
23  could have -- if I had the opportunity to amend my
24  complaint, I think I would be able to further establish
25  standing.  That's because I recently filed two job

9

1  applications with the federal government, and I know -- I

2  think 5 U.S.C. 3328 prohibits me from working in the

3  executive branch if I haven't registered.  And I think if

4  the government denied my job applications on that basis or

5  even just declared me unable to work for them, that would be

6  also sex discrimination.  That's, I think, very clearly an

7  injury in fact.  I don't think I need that, but I think it

8  would help if you think the other two bases for standing are

9  insufficient.  So leave to amend, I guess, if you dismiss.

10          THE COURT:  All right.  I'm taking notes here that

11  you're requesting leave to amend.  As -- just to follow up

12  and -- absolutely, if you were to file an amended complaint,

13  these assertions would be in writing.  But as to the job

14  applications you've made, have you received responses to

15  them, or it's an application at this point?

16          MR. VALAME:  So I just had an interview with the

17  Nuclear Regulatory Commission.  They have a job in Maryland

18  that I'm applying to.  And I also submitted an application

19  to the Defense Counterintelligence and Security Agency for

20  an auditing position.  I don't -- I haven't received a

21  response for that as far as I'm aware, but I think they

22  review them a bit later from what I've been told on their

23  website.

24          THE COURT:  Thank you.  And speaking to

25  applications -- this may be in the record, and I -- there's

10

1 many things in the record, so I may have missed it. It may

2 be even in a complaint. Have you filed with the Selective

3 Service? Or at this moment, have you not?

4         MR. VALAME: I'm not registered for the draft.

5         THE COURT: All right. And -- thank you. And I

6 will give you a chance in writing to provide more

7 information, but just to -- if you're prepared to address

8 this question right now, what would you say is your concrete

9 and particularized injury right now, even if I -- without

10 need to -- for leave to amend?

11         MR. VALAME: Oh, yeah.

12         THE COURT: Maybe you've got it right now. So

13 what's your concrete and particularized injury right now?

14         MR. VALAME: So there's two injuries that I have.

15 First is the sex discrimination. The US Government has

16 expressly threatened me with prosecution through several

17 means. On their website which I accessed they said they'll

18 prosecute me. The Department of Justice, the US attorney

19 for this district says that he expects his office to comply

20 with the act and says, you know, he's taking responsibility

21 to enforce it. There is a case --

22         THE COURT: If I might ask, when they -- when you

23 say they threatened to prosecute you, is it individualized

24 to you, or they threatened to prosecute someone in the

25 situation where they don't register?

1        MR. VALAME:  Yeah, in the situation where they

2   don't register.  But I would also know, I think, <u>Cal.</u>

3   <u>Trucking Association v. Bonta</u> 996 F.3d 644 says that if the

4   government refuse to disavow enforcement of a challenged

5   statute in litigation, that itself is "strong evidence of a

6   credible threat of enforcement."  The government has

7   conspicuously not disclaimed enforcement in any of their

8   briefing.  So I think on that basis alone, you could decide

9   the question.

10        Also, even if the threat of prosecution isn't going to

11   happen, I think the fact that they've -- and so my second

12   injury, I guess, has classified me on a sex discriminatory

13   basis, in itself, injury.  So <u>Havens Realty</u>, <u>Allen v.</u>

14   <u>Wright</u>, the Supreme Court expressly said that where you have

15   discriminatory classifications, that's an extremely severe

16   injury, and that is sufficient for Article III standing,

17   even where it does not directly impact life, liberty, or

18   property.  And I think you can kind of get that from the

19   Constitution, because the Constitution says you can't be

20   deprived of life, liberty, and property without due process.

21   But it separately says you can't be discriminated against

22   based on your sex.  And it will be very odd to say the

23   latter is identical to the former when they're separate

24   provisions that presumably the Framers thought were doing

25   separate work.

12

1      So -- yeah.  And then I guess -- you know, there's
2   other cases on the discriminatory injury theory.  I guess --
3   in cases where plaintiffs have alleged discrimination and
4   the Court has not found standing, it's usually been because
5   the discrimination was against someone else.  So I think in
6   some stigmatic injury cases like <u>Steffel v. Thompson</u> maybe,
7   like, some plaintiffs have complained that, you know, the
8   federal government subsidizes discriminatory schools
9   somewhere else, and that's a stigmatic injury on my entire
10  race.  The Court has said that's not sufficient because you
11  are not the one being discriminated against.  But I am being
12  discriminated against, because the regulations say -- you
13  know, I'm a male over 18.  I'm required to register.  That's
14  a personalized injury to me.  I am the one being
15  discriminated against, not someone else in Maine or Hawaii
16  who's being discriminated against.
17      So I think that's the only reason why the Court has
18  denied standing in discrimination cases is that someone was
19  complaining someone else was being discriminated.  I guess I
20  would also point out that plaintiffs in <u>Rostker vs.</u>
21  <u>Goldberg</u>, the plaintiffs in the prior Selective Service case
22  in the Ninth Circuit both demonstrated standing.  And they
23  had registered for the draft, so they weren't even subject
24  to criminal prosecution.  And the Courts nevertheless found
25  standing both here and in the Fifth Circuit

13

1          THE COURT:  Yes, I'm familiar with cases where a

2 person who had registered was found to have standing both in

3 the district and the decisions.  And it seems like your

4 situation is a little different from those cases in that you

5 -- or it could be.  Maybe it's not different.  But

6 factually, there's a difference in that you have not

7 registered.  So my thinking out loud is, all right, is your

8 injury concrete now or is it still abstract?  Because you

9 have not -- you haven't registered, and maybe you'll never

10 register.  And in that situation -- and is your -- the

11 threat of prosecution a generalized one, or is it particular

12 to you in some way?  That's what I'm trying to evaluate.

13          MR. VALAME:  I would say that the fact that I

14 haven't registered makes the threat even more credible,

15 because the Supreme Court has said that -- yeah, this is

16 Steffel v. Thompson.  You don't have to subject yourself to

17 criminal prosecution anyways to get standing.  I could

18 register and then sue and be in the same position.  But I

19 have subjected myself to prosecution, so the threat is even

20 more credible now.  And that further supports standing.

21      It's also -- it's concrete and particularized to me.  I

22 am subject to prosecution.  Now, there might be other people

23 subject to prosecution.  I think maybe nine-percent of men

24 have not registered according to the Selective Service.  But

25 that doesn't displace the fact that I'm subject to

14

1 prosecution.  You know, if someone challenges a general

2 statute on First Amendment grounds, they can challenge it

3 even if the statute applies to lots of people.  It can apply

4 to everyone.  There's still a concrete, particularized

5 injury to the plaintiff.

6     And then -- again, same thing with the discrimination.

7 I personally am subject to the classification.  You know, if

8 I was like a temporary immigrant, maybe I wouldn't have

9 standing because I'm not included in the draft, but that's

10 not the case.  I'm subject to felony prosecution, $250,000

11 fine.  You know, all their websites say they'll prosecute

12 me.  They haven't disclaimed it.  I think that's sufficient.

13         THE COURT:  And speak to redressability.  The

14 injury you've asserted, how will that be redressed through

15 this lawsuit?

16         MR. VALAME:  So two things.  First of all, I think

17 the Ninth Circuit has already ruled on redressability.  That

18 opinion isn't precedential, but I think this Court should be

19 very hesitant about directly contradicting the Ninth Circuit

20 in the same exact procedural posture.

21     Secondly, the Constitution is silent.  The government

22 can require women to register or strike down the

23 registration requirement to men.  But the important thing is

24 that I -- my injury will be redressed either way.  All this

25 Court has to do is say the regulations are vacated.  The

15

1  government can decide what to do.  But either way, my injury

2  will be redressed, because if both people have to register,

3  then I'm not being discriminated against.  No more injury.

4  And I think that was the Court's rationale in the recent

5  First Amendment case, National Association of Political

6  Consultants vs. Barr, I want to say.  The Court said, "The

7  First Amendment injury is discrimination in speech.  We're

8  going to strike down the discriminatory requirement, the

9  plaintiff still have standing, and we've redressed their

10 injury."  You know, the dissents had something else to say

11 about that, but they were dissents.

12         THE COURT:  All right.  Thank you.  Anything else

13 you want to tell me now?  And, again, we'll give you a

14 chance to put the things in writing after today.  But

15 anything else that right now you would like me to consider

16 in support of your standing to sue?

17         MR. VALAME:  Yeah, one more thing.  So TransUnion

18 and Spokeo say that, you know, just being legally injured

19 sometimes is insufficient to get standing.  But TransUnion

20 also has this quote, "Traditional harms may also include

21 harm specified by the Constitution itself."  So that's why

22 you don't have to show further injury if your free speech or

23 free exercise rights have been violated.  And I think since

24 the -- since, you know, for standing you assume that my

25 legal arguments are correct, if you assume the Equal Rights

16

1 Amendment, the 28th Amendment, has been enacted, that's a
2 specific legal right created by the Constitution itself, and
3 that is always sufficient to confer Article III standing as
4 long as, you know, I'm not -- I'm alleging injury to myself,
5 my own rights.  So the Constitution can create rights that
6 are automatically enforceable, unlike statutory rights.

7          THE COURT:  And why should I assume applicability
8 of the Equal Rights Amendment to your situation?  I know
9 that your lawsuit is about that.  But why at this procedural
10 junction should I assume that that is -- that you win on
11 that issue?

12          MR. VALAME:  So for standing purposes, you assume
13 the legal truth of the arguments presented.  I don't have a
14 case cite for that off the top of my head, but I know I've
15 seen it in several cases.  And that makes sense because --
16 otherwise, if you say, "Well, I don't have standing because
17 the Equal Rights Amendment isn't ratified," you're just
18 deciding the merits of the case.  That's like, you know,
19 12(b)(6), not 12(b)(1).

20      So I would say, you know, if my legal argument -- my
21 non-frivolous legal arguments are right, then I have injury.
22 Now we go to the merits.  And maybe, you know, like in a
23 personal injury case, if I allege personal injury but fail
24 to prove it, you know, you could say I lack standing because
25 I wasn't injured.  But that's a merits question.

17

1          THE COURT:  All right.  Thank you very much.

2      Mr. Rising, I want to get your weigh in on it now.  Of

3  course you didn't move under 12(b)(1) and -- but as Mr.

4  Valame has noted, there can't be a waiver of the Article III

5  standing.  So does Mr. Valame have standing in this case?

6  What do you recommend?

7          MR. RISING:  Yeah, that's correct, your Honor.  A

8  lot of new information just came in about the job

9  applications and things like that.  I'll need to speak with

10  my clients and those agencies before I can give a full

11  answer on something like this, of course.

12          THE COURT:  Yeah.

13          MR. RISING:  But you're right.  We have not moved

14  to dismiss on standing grounds explicitly in the complaint,

15  just based on what he has pled in the complaint.  Factually,

16  I think anything more would require a consultation with my

17  clients.  But we think this case is most easily resolvable

18  in the way that other Courts who considered ERA cases --

19  Taylor v. El Centro, some of the cases we cited, have

20  resolved this off the bat by just concluding that the ERA

21  does not provide a basis for a federal claim.  So I think

22  that would be the cleanest and most straightforward way to

23  look at this.  It's the reason we didn't contest standing in

24  the papers.  But I understand you have an obligation to look

25  at it as well.  So if you require additional briefing, the

18

1 defendants are happy to provide it.

2          THE COURT:  Yeah.  On the issue of cleanest and

3 efficiency, I'm going to segue, and I'll come back to the

4 topic of more briefing on standing.  Am I correct that if I

5 were to grant your motion, docket 38, as far as cleanness

6 goes, there would still be a slander claim remaining, which

7 would be the individual claim against Kett?

8          MR. RISING:  I believe plaintiff interpleading and

9 then also with us he's conceded that claim would fail.  So I

10 would expect a voluntary withdrawal or a -- I think this

11 Court has the power to dismiss it as well, because it would

12 fail for the same reasons.  But regardless, I think

13 resolving the motions before you would resolve the entire

14 case.

15          THE COURT:  Yes.  And I know Mr. Valame has said

16 -- well, he doesn't want to have that part hanging over if I

17 were -- if I granted your motion.  But I haven't decided

18 that question yet.  I haven't decided the motion.

19          MR. RISING:  Of course.

20          THE COURT:  But it goes a little bit to the

21 efficiencies of this.  And if there's no standing, then I --

22 it's not a balancing test of deciding -- of what's

23 efficient.  It's just -- there's not standing.  But I do

24 want to be mindful of what's going to be next and when it's

25 going to be.

19

1      All right.  All right.  So here's what I want to do on

2  standing -- and I'll hear your other arguments here.  You're

3  here, and I appreciate you all being here and the

4  preparation you've made for today's hearing.

5      Mr. Valame, how much time would you like to file a

6  further brief and any information you would like to present

7  in support of your standing to sue?

8          MR. VALMAE:  So a brief, not an amended complaint.

9          THE COURT:  If you wish to file amended complaint,

10 you could do that.  I'm not -- I haven't dismissed your

11 current complaint or made a finding you don't have standing.

12 So if I were to theoretically say that under your current

13 allegations you lack standing, I might give you leave to

14 amend.  You've requested leave to amend.  But before I do

15 that, I'll give you a chance to present, on your current

16 complaint, further argument in your brief.

17         MR. VALAME:  Okay.  I think that I could submit an

18 amended complaint in a brief within seven days.  Really,

19 it's not that much.  Just a few paragraphs and a few pages

20 of standing argument.  So seven days.

21         THE COURT:  All right.  And it could be that on

22 the merits that you would -- you know, separate apart from

23 standing, you might want to seek leave to amend your

24 complaint.  And so -- and, of course, the defense may have a

25 view as to whether that should be granted or not.  It's a

20

1  little bit of -- not unprecedented, but you've got on the

2  defense side a motion to dismiss and/or a motion for a

3  summary judgment.  And on a motion to dismiss, there's a

4  liberal standard for amendment.  Not a limitless standard,

5  but there's a liberal standard for amendment.  If I were to

6  rule on summary judgment that as a matter of law I'm

7  dismissing the case, you can still have leave to amend in

8  that circumstance.  But oftentimes, the defendant will say,

9  no, there should not be a leave to amend in that

10 circumstance.  But that does raise the issue of, well,

11 should I wait?  You know, if you are -- if you're telling

12 me, Mr. Valame, that you really do want to amend your

13 complaint -- and I don't know until I see your amended

14 complaint what all you might be amending -- should we have

15 the other arguments on the current complaint now, or should

16 we sort of wait and see what you put in your amended

17 complaint before we pick up the arguments?

18       MR. VALAME:  So I don't want to delay decision in

19 this case.  If I amended my complaint, I think I would only

20 add the job application arguments on standing and just

21 clarify that.  The merits would remain unchanged.  And I do

22 think that if this Court ruled against me on the merits, any

23 amendment will be futile because the Fifth Amendment claims

24 are foreclosed.  If there's no 28th Amendment, there's no

25 28th Amendment.

21

1        THE COURT:  Right.

2        MR. VALAME:  And I'll just take an appeal.

3        THE COURT:  Yeah.  Thank you.  All right.  That

4 gives me some clarity there.

5     All right.  So, Mr. Rising, then as to when you would

6 like to provide any more information and/or response on the

7 standing arguments, what deadline would you request?

8        MR. RISING:  Your Honor, I think it might depend

9 on whether we're filing a new motion to dismiss and for

10 summary judgment on a brand new complaint or not.  But given

11 the holidays -- I have another hearing in January as well.

12 I think preferably four weeks after plaintiff's.

13        THE COURT:  All right.  How about we set -- so we

14 request from Mr. Valame a further submission by December

15 20th, the date you suggested, you have a week.  And how

16 about we go January 12th for a response from the government?

17        MR. RISING:  Sure.

18        THE COURT:  Writing that down.  And would you like

19 to reply, Mr. Valame?  I know it's a bit abstract until you

20 see what their response is.

21        MR. VALAME:  It is a bit abstract.  I want to lean

22 towards no because I'm not sure how much it would help the

23 Court if I filed a reply brief, but, you know, if they make

24 something I haven't thought of.

25        THE COURT:  Yeah.  Here's what I'll leave it at,

22

1 after you read their -- after you read the -- what they

2 submit, if you seek leave to file a reply, I'm going to ask

3 you to make that decision quickly, just so I know what

4 you're doing.  So I'll ask you by the 13th -- by the next

5 day to either request leave to file a reply.  And the answer

6 is I'll likely give you leave to file a reply if you wish

7 to.  Or if you tell me you don't want to, then I'll know

8 that you're -- don't wish to file a reply.

9          MR. VALAME:  Yeah.  I think I can file a request

10 for reply the day after --

11          THE COURT:  Yeah.

12          MR. VALAME:  That's another week, yeah.

13          THE COURT:  Just a one paragraph saying you have

14 more you would like to say, or you don't have more you would

15 like to say, and then I'll know that it's been submitted.

16 And I don't anticipate having a need for a further hearing

17 to talk about standing issues.  I'll do it based on the

18 papers is my expectation.  But if I change my mind, then

19 I'll let you know with reasonable notice that I want to

20 reconvene for further conversation.

21     All right.  This is all very helpful, and I thank you

22 for your patience addressing standing.  So that -- let's put

23 that aside for the moment, and I will determine it before

24 making a final decision, but we've got a process in place to

25 figure it out.

23

1      All right.  Mr. Valame, I'm going to have you go first
2  on your motion.  Now, you both got motion -- things you're
3  asking for from the order, so I'll give you a full chance to
4  argue these things.  But you do have a motion for summary
5  judgment as to the first three claims in your complaint.  So
6  I'll give you an opportunity to tell me why I should grant
7  your motion, and then I'll have Mr. Rising address your
8  arguments and what he disagrees with and his request for
9  judgment on their claims.  And then, Mr. Valame, I'll come
10 back to you for your reply on your arguments, but also on
11 his arguments, if that makes sense.
12          MR. VALAME:  Yeah.
13          THE COURT:  All right.  Mr. Valame, you may stay
14 there or come up to the podium, whichever is comfortable for
15 you.
16          MR. VALAME:  Thank you, your Honor.  The
17 defendants' position relies on the belief that text outside
18 of Article V can amend Article V, and that position is
19 untenable.  Everyone agrees that the prefatory text of
20 amendments does not become part of the Constitution of the
21 United States.  Every single amendment ratified, it's just
22 the text.  You don't see, you know, all or some of them in
23 the Bill of Rights.  You don't see any of the other
24 proposing texts, any of the other amendments.  And that
25 makes sense.  They're not part of the Constitution of the

24

1  United States.

2      However, defendants also concede in their OLC opinion

3  that to amend the effect Article V has on amendments, you do

4  have to include the text in the amendment.  So take section

5  three of the 28th Amendment.  That includes a two-year grace

6  period.  The OLC acknowledges that without that text,

7  Article V would say the amendment is ratified immediately.

8  What the section three does is it amends Article V to change

9  that aspect of the amendment.

10      And that is why the deadlines contained in the 18th to

11 22nd Amendments are all valid.  When the amendment is

12 ratified, the deadline immediately amends Article V and says

13 -- and imposes an additional condition on ratification.

14      When the deadline is in the proposing clause of the

15 amendment, it can't amend Article V.  It has no legal force

16 outside of what the Constitution allows Congress to specify.

17 And Congress' power in that area is extremely limited.  The

18 Constitution says the one mode or the other.  And the two

19 modes are ratification by legislatures or ratification by

20 Convention.  It's difficult to imagine how the Constitution

21 could have been clearer that Congress has only two options

22 with amendment ratification procedures.

23      And I think, you know -- I'll address _Dillon_, which is

24 their primary case.  But I think it's worth thinking about

25 what the consequences of the defendants' position is.

25

1  According to the defendants, Congress can impose any limit

2  on ratification in the proposing clause of an amendment.

3  Congress could say, "This amendment should be ratified when

4  four-fifths of the states have ratified it.  This amendment

5  takes effect five years after ratification" in the proposing

6  clause.  That's one thing.

7       But, second, and maybe more importantly, according to

8  the defendants, putting the deadline in the proposing clause

9  allows Congress to amend it at its leisure by bare

10 majorities without a presidential veto whenever Congress

11 wishes.  And that gives Congress enormous leverage over the

12 ratification process.  It essentially allows Congress to

13 revoke the proposal of an amendment.  If Congress proposes

14 an amendment, the next Congress doesn't like it -- you know,

15 scholars have all agreed that Congress can't revoke an

16 amendment under Article V.  But according to defendants,

17 they could just impose a one-year deadline and make it

18 impossible for the states to ratify.

19            THE COURT:  Or one-day deadline.

20            MR. VALAME:  Yeah.  One-day deadline, one second

21 deadline, whatever they want.  And, again, no presidential

22 veto, bare majorities in both houses of Congress.  And they

23 can do whatever they want.  There's no reason why it's

24 confined to a deadline.  The Congress, if it sees an

25 amendment nearing ratification, could say, "Well, we need

26

1 all 50 states to ratify this amendment for it to be valid."

2      THE COURT:  Now, I imposed the question of a

3 one-day -- but in this case, there's not a one-day deadline

4 that Congress set.  It was much -- something much more

5 generous.  And so to keep it tied to the facts of this case,

6 in this situation with the deadline Congress set, why should

7 I say that that was unreasonable, if that's the right

8 standard?

9      MR. VALAME:  So this Court shouldn't say the

10 deadline is unreasonable, because in Coleman, the Court very

11 clearly said that's not something Courts can do.  Courts

12 can't review Congress for reasonability.

13      THE COURT:  Yeah.

14      MR. VALAME:  What I'm asking this Court to do is

15 to say that there are -- there is no deadline.  It doesn't

16 matter if it was 100-year deadline or one-day deadline, the

17 deadlines or anything else in the proposing clause of an

18 amendment, except a mode of ratification, the one or the

19 other, is nothing.  It's a nullity.  It can't be enforced

20 against Article V's clear text.

21      So I guess that brings us to Dillon, which is their

22 best case, I would say.  And I think Dillon was a case about

23 the 18th Amendment.  And it was really about facts of the

24 ratification of the 18th Amendment.  And I think you can see

25 this in a lot of places in the Dillon opinion.

27

1    So you can start with the -- all right.  So you could
2  start with, you know, page 373 to 374.  It says Congress has
3  a wide range of power in proposing amendments, and it says,
4           "The only limitations are the two-thirds
5           requirement and the requirement that
6           they can't destroy equal suffrage in the
7           Senate."
8       Now, that only makes sense if you're talking about the
9  content of proposed amendments.  It's a very odd
10 interpretation of the Court's ruling that we say Congress
11 can do literally anything even outside the text of proposed
12 amendments as long as it doesn't destroy equal suffrage in
13 the Senate.  And so that's one thing.
14      Second of all, page 371 of Dillon says,
15          "The article says nothing about the time
16          in which ratification may be had or that
17          it must be had within some reasonable
18          amount of time."
19      So the Court also says,
20          "This is not an argument in -- from
21          Article V in the deadline.  It's
22          something that Congress has put into the
23          Constitution by ratifying this 18th
24          Amendment with three-fourths of the
25          states."

1     And then, again, on page 376, it says, "Every amendment
2  has an implicit deadline."  That was the centerpiece of the
3  Court's ruling in Dillon.  What Congress is doing, it is
4  taking the deadline implicitly from the amendment and making
5  it explicit, and then the states can ratify that deadline.
6     And then lastly, I would point you to the appellants
7  brief in the case.  That brief is very clear about what
8  appellants are asking the Supreme Court to do in Dillon.
9  They're saying the state legislatures had no power to ratify
10 the 18th Amendment, because the 18th Amendment essentially
11 coerced a ratification by making them do it too quickly.  It
12 says they violated state procedural rules in doing those
13 ratifications.  It says that Congress is destroying the
14 federal structure of the United State by including this text
15 in the proposed amendment.  The entire brief is an attack on
16 the content of the amendment.  And in Dillon, the Court
17 said, "No, you can't attack the content of an amendment.
18 Congress has plenary power unless it destroys equal suffrage
19 in the Senate."  And I think, you know, that's also
20 consistent with how later cases interpreted Dillon.  So US
21 v. Sprague, the Court says there are exactly two modes of
22 ratification and Congress has exclusive discretion over
23 those two modes only.
24     If Dillon really said that Congress can impose anything
25 that doesn't violate, you know, the equal suffrage clause,

29

1  then that discussion in Sprague makes no sense, because

2  Congress has exclusive power for, you know, really any

3  condition provided that, you know, maybe the bare minimum

4  there's three-fourths of the states still left to ratify it.

5       So, I guess the text the US relies on is this line, "We

6  hold it's an incident to the power of Congress to designate

7  the mode of ratification."  And the government latches onto

8  it.  It says that its incident of a power designate the

9  mode.  "We always put the mode in the prefatory text.  And

10 therefore, this incident to the mode, it can also be in the

11 prefatory text."

12      So there's a few arguments on that.  First of all, I

13 think that's reading that line for way more than it's worth

14 in the Court's opinion.  You know, we have -- the entire

15 opinions about the content of amendments.  And then it says

16 Congress is competent to do this because they can recognize

17 the political, social, and economic factors in amendment.

18 So we hold it to incident to the power to designate the

19 mode.  So that same Congress has expertise in the area, so

20 Congress can be trusted to make the decision.  It's not

21 saying Congress can be trusted to make the decision outside

22 the safeguards of Article V.

23      And, you know, maybe this is an aside, but, you know,

24 the government says Article V imposes a lot of safeguards on

25 Congress.  You shouldn't be so worried.  Well, first of all,

30

1  the biggest safeguard of Article V is ratification by

2  three-fourths of the states, which the government says it

3  doesn't have to happen.  Second of all, the government

4  thinks that bare majorities in both houses of Congress can

5  do whatever they want with amendments.  The OLC has taken

6  the position there's no presidential veto.  It's bare

7  majorities.  And the OLC says it's the only time Congress

8  can exercise power by bare majorities without any

9  constraints.  And that's really an extraordinary assertion.

10 I mean, I have a lot more arguments.  Are there any

11 questions on this?

12          THE COURT:  I do not so far.

13          MR. VALAME:  Okay.  So I would say that this text

14 about the mode of ratification is pretty clearly, you know,

15 dicta, and it's not even considered dicta -- that's, you

16 know, very persuasive on the Court.  It's really not about

17 the mode power of ratification.  It's just saying Congress

18 has expertise in this area.

19     Next, even if you think Dillon said that Congress had

20 the power incident to the mode and that really is incident

21 to the mode in that Congress can put in the prefatory text,

22 Dillon is almost certainly not good law on that aspect any

23 more.  The 27th Amendment -- you know, Dillon's analysis is

24 it will be absurd if amendment stood for all time, because

25 then you could ratify a Congressional Compensation

31

1  amendment.  Well, guess what?  That amendment was ratified.

2  Congress approved it, I think, like 512 to three in both

3  houses -- like, House was 414, three, Senate was unanimous.

4  Everyone agrees the 27th Amendment is legitimate.  And that

5  takes the entire force of <u>Dillon's</u> reason, because <u>Dillon</u>

6  said Congress' power to impose deadlines is merely the power

7  to liquidate an already existing deadline.  But there is no

8  already existing deadline, there's nothing to liquidate.

9  And therefore, the only rationale for Congress being able to

10 impose deadlines is that Congress is merely proposing a

11 deadline as part of the amendment.  And when that amendment

12 is ratified by three-fourths of the states, the deadline is

13 valid, not because of Congress' power, but because it's part

14 of the Constitution of the United States.  And it's valid

15 because the Constitution is sovereign.

16      So -- and, again, this goes back to section three of

17 the 28th Amendment and the 20th Amendment.  The deadlines --

18 or not the deadlines.  The delays in effect -- those also

19 amend Article V.  It's the same rationale.  If you want to

20 change the effect of Article V, which is immediate validity

21 when three-fourths of the states ratify, you have to amend

22 Article V.  And, you know, the Court said <u>US v. Sprague</u> that

23 exact thing.  It said, "If you want to change this, you

24 know, single finely wrought ratification procedure, amend

25 Article V."  And that's what these other amendments do.  The

32

1  US says you cannot recognize -- <u>Dillon</u> is no longer good law

2  because of vertical stare decisis.  But where constitutional

3  amendments overrule Supreme Court precedent, vertical stare

4  decisis has no role to play.  You know, I cite a poll tax

5  case from 1964.  That district court didn't wait for the

6  Supreme Court to recognize that the poll tax amendment

7  overruled precedent.  And I don't think this Court has to

8  wait for the Supreme Court to acknowledge that the 27th

9  Amendment directly contradicts its holding that the 27th

10 Amendment can't be ratified anymore.  So those are all

11 reasons why it -- oh, and then lastly is <u>Coleman v. Miller</u>,

12 I guess.

13        THE COURT:  Uh-huh.

14        MR. VALAME:  It says that language, "We have held

15 that congress may impose a reasonable time for

16 ratification."  Again, that's in the context of the 18th

17 Amendment.  So it's deadlines in the text.  It had nothing

18 to say about deadlines outside the text.  There's a snippet

19 in the opinion, I think, the D.C. District Court relied on

20 that <u>Coleman</u> plurality said, "Deadline either in the text of

21 the Amendment or in the proposing clause."  And then the --

22 you know, the argument is that, oh, they said, "In the

23 proposing clause," so that indicates it can be in the

24 proposing clause.

25       So, first of all, no one had even considered in 1939

33

1  that it could be in the proposing clause.  The 23rd

2  Amendment was in 1960.

3       Second of all, that's a plurality holding of Coleman

4  that did not have the assent of all the justices or even a

5  majority of the justices.  You know, the Supreme Court has

6  said Coleman is limited to exactly one thing.  That's a

7  holding.  And that is state legislature standing on a vote

8  nullification theory.  Every other part of Coleman is a

9  plurality -- very fractured plurality.  You know, Justice

10 Scalia said it's hardly even a legitimate judicial decision

11 the way that less than a majority of the Court issued a

12 judgment.  So I think this Court should not rely on such an

13 opinion to rule that the Equal Rights Amendment is no longer

14 valid.

15      So once we no longer consider Dillon, I think the

16 textual argument is unbeatable.  The one or the other mode

17 of ratification says only one or the other mode.  A deadline

18 is not one of the modes, therefore there can be no deadline.

19 I guess -- the government points to history.  So the

20 government says that congressional practice can liquidate

21 the meaning of the Constitution if it's indeterminate.

22      Som first of all, the meaning of the Constitution is

23 not indeterminate.  The one or the other is as clear as it

24 can be.  And, you know, just because something has been done

25 a long time, if it's contrary (indiscernible) to the clear

34

1  text, then the text controls.

2      Second of all, the practice the government relies upon

3  is 12 years of practice.  Not 100 years, not 60 years, 12

4  years.  From 1960 to 1972, Congress had deadlines in the

5  proposing clauses.  The next amendment proposed by Congress

6  had a deadline in the text like the past amendments.  So,

7  you know, even the most capricious Supreme Court cases in

8  the foreign policy arena have required 20, 30 years of

9  consistent practice to liquidate the meaning.  Twelve years

10 in an arena of, you know, very important constitutional

11 magnitude, not foreign policy where you have deference to

12 the political branches.  Twelve years is just not enough to

13 liquidate anything.

14     And then, you know, there's the Stephen Sachs' article,

15 which I cited in my motion for summary judgment.  I just --

16 the Sachs' article concedes that for its analysis to have

17 weight, you have to conclude the instructions in the 12th

18 and 17th Amendments were legally binding guidance on the

19 meaning of the amendments.  But those instructions are

20 clearly not.  Those instructions are declaratory of what the

21 amendments do.  Both amendments are obviously implied

22 repeals of prior parts of the Constitution.  And, you know,

23 what Sachs says is that, oh, the parts that the prefatory

24 text specifically mentions are presumptively repealed.

25 Every other part of the Constitution is presumptively not

35

1  repealed.  But Sachs is just describing the (indiscernible)

2  against implied repeal, which already applies to

3  constitutional amendments.

4      So I think -- you know, you can just think about it

5  this way, if that prefatory text didn't exist, is there any

6  case in which the meaning of the amendments would come out

7  differently?  I can't imagine how the prefatory text would

8  ever change the real-world application of those amendments.

9  And I think that goes to show, you know, for 200 plus --

10  well, yeah, for like 180 years, no one thought the

11  Constitution could be effectively changed by text in the

12  prefatory clauses until 1960.

13          THE COURT:  This is a question not just limited to

14  your -- this contextualist argument.  But big picture -- if

15  you are right in your constitutional analysis --

16          MR. VALAME:  Uh-huh.

17          THE COURT:  -- and if I determine you have

18  standing, it would seem that a lot of other people could

19  make the same arguments in connection with the Selective

20  Service registration requirements.  But to my knowledge, no

21  Court has gone your way on this.

22      So, first, historical question.  Am I wrong about that?

23  Is there some Court that has agreed with your constitutional

24  analysis and has granted a plaintiff in your situation the

25  relief that you seek?

36

1      MR. VALAME:  So no Court has considered this

2  question.  So the answer is no.  But, you know, again, if no

3  Court has considered the question, it's hardly a surprise

4  that I haven't had any favorable rulings for my position.

5  So the two district court cases they cite, I think Taylor

6  vs. El Centro and a prison case -- you know, I don't want to

7  denigrate pro se plaintiffs, but those were obviously

8  frivolous claims that were filed before the 20th Amendment

9  even took effect.  They were filed before the two-year grace

10 period.  I think, you know, saying from the one line

11 footnotes, "20th Amendment is not an amendment" with no

12 briefing or argument would not really be a way we do

13 persuasive authority in the courts.

14     Second of all, Illinois vs. the Archivist.  You know,

15 clear and indisputable is the Mandamus standard.  I think

16 the Ninth Circuit has said clear error is -- hits you with

17 all the force of a five-week-old rotten, dead --

18 unrefrigerated dead fish, and Mandamus is even higher than

19 clear error.  So the fact that the D.C. circuit said it's

20 not clearly indisputably correct that the Equal Rights

21 Amendment is ratified in a case where the states probably

22 even lack standing should not be adverse precedent in this

23 question where you're reviewing the issue denote.

24      THE COURT:  Sorry.  So you're -- in conclusion --

25 I'm not putting words in your mouth.  This has not received

37

1  a rigorous analysis before by other Courts is your view?

2         MR. VALAME:  Well, I don't want to say the

3  analysis wasn't rigorous, but it -- no Court has reviewed

4  the precise question before your Honor, which is, under a de

5  novo standard of review, is the Equal Rights Amendment part

6  of the Constitution of the United States?

7         THE COURT:  And if I determine that you're right

8  in your analysis and their arguments are wrong, and you have

9  not filed -- this as a class action, you're -- the remedy

10 you're seeking is as to you.  But pragmatically, it would be

11 a pretty wide-reaching remedy potentially.

12     So address the political question aspect of it and the

13 big picture consequence if I were to go your way on your

14 motion for summary judgment.  What would be the practical

15 consequence of that?

16         MR. VALAME:  So I think there's kind of two

17 distinct issues.  There's the remedy question and there's

18 the political question, doctrine.  So I'll talk about

19 political question first.  The fact that it's about the

20 draft in foreign policy doesn't make it a political

21 question.  My Fifth Amendment claims, for example, I don't

22 even think the United States says those are political

23 questions, and the Supreme Court decided them on the merits

24 in 1980.  So the fact that it's, you know, a draft, which I

25 -- you know, it's a military thing.  It has foreign policy

38

1  implications.  I acknowledge that.  That doesn't make it a
2  political question.
3      So if we go to the deadline -- that's the first thing,
4  deadline and state rescissions.  The deadline is not a
5  political question.  I'm just asking the Court to undergo a
6  normal textual analysis of the Constitution.  Is there --
7  can Congress impose a deadline in the prefatory clause.  And
8  just like the Carey case in 2012, you know, that might touch
9  on other branches -- it might disagree with the other
10 branches.  But there's no demonstrable textual commitment
11 that Congress decides all questions with Article V.  You
12 know, maybe four justices in Coleman thought that, but that
13 view has been rejected ever since.
14          THE COURT:  Uh-huh.
15          MR. VALAME:  I cite Justice Stevens in the 1970s
16 talking about that.  It's not a political question.  The
17 deadline just requires familiar application of
18 constitutional tools.
19     So if there's no textually demonstrable commitment, the
20 standards are judicially manageable.  We're not asking the
21 Court to say deadlines have to be reasonable.  That might be
22 unmanageable.  We're saying no deadlines or yes deadlines.
23 That's as manageable as it gets.  Then there's the
24 prudential factors of Baker vs. Carr.  Congress hasn't
25 spoken on the question.  You're not disrespecting coordinate

1  branches.  We don't have the enrolled bill rules.  There's

2  no unusual need for pressing adherence to a political

3  decision already made.  And, yeah, I don't think even the

4  government makes the political question argument on the

5  deadline.

6       So now, state rescissions.  I think the Court can

7  decide the political question like very easily, because the

8  states that have rescinded the ratifications have all said

9  expressly, "We do not believe the political question

10 doctrine applies."  So if all the states say, "Courts,

11 please decide this question" -- that was in a brief with the

12 D.C. circuit, by the way.  They said that and the district

13 court.  So if the states say that, then there's no reason

14 why the Court shouldn't.  And even absent that concession,

15 again, it's just the familiar application of constitutional

16 factors.  The Supreme Court has had similar questions with

17 term limits, with, you know, faithless electors in 2020.

18 Those were all state prerogatives that kind of presented a

19 similar analytical question, and the Supreme Court decided

20 them, I don't think even mentioning the political question

21 doctrine.  And I would note that the D.C. District Court's

22 analysis also included discussion of political question.

23 That Court found that there was no political question.  But,

24 again, the Mandamus standard is so high, the plaintiffs

25 couldn't reach it, and the district also found they lack

40

1  standing.  So that doesn't really apply in this case.

2       In terms of remedy -- so I'm asking for three remedies.

3  So I think the government concedes that a declaratory

4  judgment at absolute minimum as applied to me is

5  appropriate.  Injunctive relief as applied to me, I don't

6  think the government has made a serious effort to show that

7  my absence from the Selective Service would cause any

8  irreparable harm.  So if I prove my constitution rights were

9  violated, that creates a presumption of harm, presumption of

10 public interest, so an injunction should issue.

11      I think the biggest feud is over vacating regulations

12 for the Selective Service.  And I think, you know,

13 defendants don't really grapple with the fact the Ninth

14 Circuit has said the presumptive remedy for violation of the

15 APA, which says, you know, constitutional rights are

16 protected in administrative proceedings, is vacating the

17 regulations.  And they cite some dissenting opinion saying,

18 vacatur might not be authorized by the APA or it's not

19 appropriate.  You know, I cite Justice Kavanaugh who says it

20 is.  Maybe the Supreme Court will decide that.  But in the

21 Ninth Circuit, vacatur is the presumptive remedy.  And the

22 Ninth Circuit has said it's only not presumptive -- I think

23 I wrote this down here -- where the agency has -- where the

24 agency is "capable of resolving the issue on remand without

25 vacatur."  That's <u>Mont vs. Howland</u> (phonetic).  But the

41

1  Selective Service has said, "If you remand without vacatur,
2  we're not going to reconsider the issue because we don't
3  have any authority to do that."  So remanding without
4  vacatur would be futile.  The only option for the Court is
5  to do as the APA says and set aside the unlawful
6  regulations.

7       And I acknowledge that will have maybe a large impact
8  because the Selective Service won't be able to compel people
9  to register until Congress acts.  And I would say two things
10  about it.  First of all, if you vacate the regulations, I
11  think it's virtually assured the vacatur will be stayed on
12  appeal either by your Honor or the courts of appeal.  So the
13  impact won't be felt for some time.  And I say -- you know,
14  the Fifth Circuit has said that's a relevant consideration
15  when deciding the --

16            THE COURT:  It's irrelevant or relevant?

17            MR. VALAME:  Relevant --

18            THE COURT:  Relevant.

19            MR. VALAME:  -- when deciding the equities.

20       Second of all, we're not at the preliminary injunction
21  stage.  If you determine that I'm right on my legal
22  arguments, you're saying I have a 100-percent chance of
23  success on the merits, which means for purposes of according
24  the remedy, you don't have to consider the risk that you're
25  wrong.  Now, when you consider a stay pending appeal, that's

42

1 a different analysis, the four factor stay test.  You might
2 decide to stay your opinion or your order.  But vacatur
3 should be granted initially at least.

4     And you know, I do think the two-year grace period
5 supports that -- the people already said Congress has two
6 years to comply.  I don't think this Court has the authority
7 to change that interest balancing and say, "Well, Congress
8 should have even more time, and we're not going to have any,
9 like, enforceable compulsion on Congress."  I don't think
10 that's in accordance with the 20th Amendment's text.

11     Okay.  What else do I have to say on this question?
12 Stephen Sachs.  Oh, the US says my arguments are circular on
13 the deadline.  I'll be honest, I don't really understand
14 what the US means by that, but I'll just explain how my
15 interpretation of Article V worked in practice.

16     So if Congress wants a deadline on an amendment, they
17 would propose an amendment with the deadline in the text.
18 Now, that deadline isn't legally operative when it's
19 proposed.  The only thing that's legally operative is the
20 proposal itself, which is before the states and the mode of
21 ratification.  But when three-fourths of the states ratify
22 that proposal, the deadline immediately becomes law.  So
23 let's say the deadline has expired, but states, you know,
24 symbolically, maybe, ratify anyways, the amendment will
25 become part of the Constitution, but then the deadline would

43

1  say, okay, I'm amending Article V, and the amendment no

2  longer has legal effect.

3      So it's not circular.  The amendment is still part of

4  the Constitution.  It just has no legal effect.  And, you

5  know, state governments are entitled to symbolically ratify

6  amendments.  Congress does symbolic gestures all the time.

7  So I don't think that circularity is a reason to reject my

8  position.

9      Let me see if there's anything else I have written down

10 here.  Oh, the Nash -- the Idaho case where the Supreme

11 Court vacated it under Munsingwear.  So the government

12 doesn't answer my citation to Wisconsin Department of

13 Revenue vs. Wrigley, which, you know, specifically says

14 Munsingwear vacaturs aren't precedent.  That makes sense.

15 The whole point when the Supreme Court vacates a lower court

16 decision under Munsingwear is they don't want anyone citing

17 it for legal consequences.  So I think it would be not

18 respectful to the purpose of the Munsingwear vacatur to say,

19 "Oh, maybe this is like a secret ruling that the amendment

20 expired anyways."  But even if you wanted to try to get the

21 tea leaves from Idaho vs. Nashville Organization of Women,

22 the Supreme Court would have vacated it on mootness grounds

23 even if the amendment was still pending.  Idaho's complaint

24 in that case asked for an injunction and joining the

25 administrator of general services from treating the deadline

44

1 extension as valid.  Once the deadline extension expired,

2 the request for relief in Idaho's complaint became moot.  So

3 even if the amendment was still pending in that specific

4 case, mootness would still have been granted.  Or the

5 Supreme Court could have just thought that, you know, no

6 state has ratified in the past three years.  That means

7 unlikely, regardless of the deadline or validity of the

8 amendment.  So there's no concrete ripe injury at the

9 moment.

10     The point is we don't know why the Supreme Court

11 vacated it.  I can't even find a lot of the materials in

12 that case in the public record.  Maybe the government has

13 them.  But I don't, and I don't think the Court should

14 speculate so much on what the Supreme Court did all those

15 years ago.

16     Precedent.  Oh, I think last thing I might have to say

17 is, it's not the case that everyone accepted the deadline in

18 the prefatory clause was valid when it was proposed.  So,

19 you know, I made a bit of a list here.  So when in 1933

20 people first proposed to bring the deadline in the prefatory

21 clause, Lamar Jeffers objected, Rep Ramseyer rejected --

22 objected to that.

23     The House report in 1978 says that nothing in Article V

24 says provisions concerning the mode for ratification must be

25 passed by two-thirds super majorities or that the deadlines

45

1  in amendments are part of the amendments themselves.  In
2  fact, the OLC report they relied upon says that, citing Rep
3  Jeffers and Rep Ramseyer, the evidence is to the contrary
4  that this prefatory deadline is valid.  When Senator Calfer
5  (phonetic) proposed the deadline in the prefatory text to
6  the 23rd Amendment, Senator Russell stood up and said, "This
7  is a departure from any draftsmanship I've ever seen with
8  regards to constitutional amendments."  And he was very
9  dubious that this would have the same, you know, inoperative
10 effect as the deadlines contained in the texts of prior
11 amendments.
12     So I -- and then I also have this statement from 117
13 Congressional Record, 3584 from 1971, saying the deadline is
14 merely a statute and isn't like a constitutional status.  So
15 it's like a smattering of statements.
16         THE COURT:  And that was in the context of -- what
17 was that in the context?
18         MR. VALAME:  So the deadline as a statute is from
19 the Equal Rights Amendment debates.  It's from 1971 I have
20 written here.
21         THE COURT:  Got you.
22         MR. VALAME:  I found it in a lot of the article
23 from 1980.  So it's like, yeah, bit of a historical
24 searching.  But I was able to find all these statements of
25 doubt that the deadline was valid.  So it's not the case

46

1  that, you know, I'm coming in 40 years later and unsettling

2  everyone's expectations in order to get an amendment

3  ratified.

4        THE COURT:  You've done lots of digging.  Well,

5  different procedural topic.  In a case alleging a

6  constitutional violation, we rarely have a settlement

7  conference in those cases because there's polarity -- yes,

8  no, no, yes.  There's not much gray area in between to say,

9  well, we compromise by striking down half of the statute or

10  by something like that.  So we don't usually have a

11  settlement conference.  There's something unusual in your

12  situation, and I don't need to dig too far into the facts,

13  but at the beginning of our hearing today, you mentioned

14  that you had applied to work for the government in a few

15  different jobs.  And I don't need to delve into whether

16  you're qualified and what those positions are.  And Mr.

17  Rising has not evaluated those, and he doesn't know the

18  answer to those right now either.  But it occurs to me if --

19  that there may be -- you maybe have different objectives,

20  and I don't know what all your objectives are.  But in a

21  settlement conference, which is a non-public proceeding, you

22  can have a communication about those things to figure out on

23  the plaintiff side what are your objectives, on the defense

24  side what are your interests and objectives.  And sometimes,

25  there might be something that is not obvious to the Court as

47

 1  to what might be a way to be a win-win solution or to give
 2  both parties something of what they're wishing that would be
 3  a good solution.  I have no idea if that's possible.  But it
 4  occurs to me because you've got some other things that were
 5  outside the pleadings, and there's some facts which I didn't
 6  know about until we got here, and the defense is hearing
 7  about for the first time.  So this a case where there would
 8  be utility in a settlement conference to have you get
 9  together, you know, in a less formal setting without a
10  record to explore and see if there's a compromise or my --
11  or is that not a good use of your time?
12          MR. VALAME:  So I don't think that would be a good
13  use of time.  I didn't apply to the jobs to manufacture
14  standing for this case.  I'm actually applying for them, and
15  I think, qualified.  And I would appreciate if the
16  government agreed not to enforce the regulations against me
17  for the pendency of this litigation.  But a settlement
18  conference requires give and take on both sides, and I'm not
19  sure what I would be able to offer the government in
20  exchange for any concessions.  The individual claims aren't
21  for the Court, really, and they wouldn't help with the job
22  applications anyways, and I wouldn't dismiss my complaint or
23  alter it in order to get those jobs.  If they deny me the
24  jobs on this basis, I would probably come here and ask for
25  an injunction, honestly.  So I don't think a settlement

48

1 conference would be worthwhile because there's just nothing
2 I can offer the government.

3          THE COURT:  All right.  Thank you.  Think about
4 that.  I'll ask Mr. Rising the same question.  It does take,
5 as they say, two to tango.  So I sometimes order people to
6 have a conversation that doesn't compel a result, but just
7 have a conversation, because sometimes there's an area of
8 overlap that's not obvious to me that can become obvious
9 once the parties are talking with each other directly.  So I
10 hope you keep an open mind to whether there is something
11 less than taking us to the Supreme Court, which you know is
12 a few hurdles away from where you're at right now.  But it
13 seems like you're well prepared for a long legal argument,
14 and I appreciate your presentation.

15     Anything else you would like me to consider?  Now, I
16 will give you a chance to reply to them.  But anything else
17 you would like to tell me?

18          MR. VALAME:  So do you want to hear argument on
19 the state rescissions issue or --

20          THE COURT:  I don't need to hear anything more
21 because you've given me a lot of information already.  But
22 I'm giving you open floor if you -- if you've got more that
23 you want to highlight for me.

24          MR. VALAME:  Okay.  I guess I just point the Court
25 to my arguments and why implied power should be construed

49

1  narrowly.  There's a lot of case law on that issue.  Supreme

2  Court has said it's only absolutely necessary powers and the

3  fact that, you know, for the first 100 and something years,

4  there were no deadlines at all kind of proves that it's not

5  necessary for Congress.  And that's especially true because

6  this is Congress exercising power unilaterally and,

7  according to the government, by bare majorities with no

8  other checks.  I don't think I have to repeat that all the

9  way here, but it's an important consideration when

10 evaluating the scope of congressional power.

11     I think that's all I have to say.  My voice is going

12 dead.  So I'll let the government --

13         THE COURT:  I've exhausted you.  All right.  Thank

14 you very much for your presentation.

15     Mr. Rising.  Thank you for waiting.

16         MR. RISING:  Thank you, your Honor, may --

17         THE COURT:  And just to be a hot bench, if I might

18 jump in just on this settlement conference idea.  And I'm

19 putting you on the spot, because it was not something I

20 prepared you for in advance, but what's your reaction to

21 that concept?

22         MR. RISING:  Of course.  We're happy to discuss,

23 but it's something that I would have to speak with my

24 clients and the department first.

25         THE COURT:  Yeah.  On that, what I'll do for both

1  of you is to -- rather than spending more time on that topic

2  now, after our hearing, go home and confer with your

3  colleagues and think about it.

4       And, Mr. Valame, you don't have anyone to confer with,

5  but think about it.

6       And I'll ask you each to file a kind of a case

7  management response in a week's time just telling me what

8  your views are.  If you think it wouldn't be helpful, you

9  can say that, or that you do think it would be productive,

10 that that's what you think.  And also timing.  If you said,

11 you know, you think it should be later or after the Court

12 has decided this or sooner that -- you can give me that

13 guidance too.

14      All right.  So that's a little segue.  But, Mr. Rising,

15 there have been much discussed there.  I'll give you open

16 floor.

17           MR. RISING:  Thank you, your Honor.  So jumping

18 straight to the Equal Rights Amendment piece, because I

19 think plaintiff has pretty clearly conceded the Fifth

20 Amendment claim is not a viable vehicle for him at this

21 point.  Much of plaintiff's argument focuses on making the

22 case into something much harder than it really is.  This is

23 not a case where the government is asking the Court to say

24 that Congress could compel ratification by 100-percent of

25 states instead of three-quarters.  This is not any of the

51

1  many harder cases that plaintiff addressed.

2      Instead, this is a case that involves Congress doing

3  something it's done for hundreds of years.  It's imposing a

4  ratification deadline, which the Courts upheld in <u>Dillon</u>,

5  which the <u>Coleman</u> Court found was a holding, and which most

6  recently in D.C., the D.C. circuit just found was a

7  permissible exercise of Congress' Article V power.

8      Plaintiff really depends on the distinction between

9  deadlines in text versus deadlines in the prefatory clauses.

10  This is really a distinction without a difference.  Congress

11  has been including legally operative language in prefatory

12  clauses since the Bill of Rights.  And that congressional

13  history, that level of historic practice is not 12 years.

14  That's hundreds of years.

15      In those first early amendments, Congress included the

16  mode of ratification in there.  That would be ratification

17  by the Convention or ratification by the states, and then

18  also instructions that the states could ratify any of the

19  Bill of Rights or all of them.  To hold that plaintiff's

20  view applies and that a prefatory clause language is totally

21  meaningless would be to invalidate all of that language in

22  the Bill of Rights, which we've understood to be part of how

23  those amendments were ratified since the beginning of this

24  country.  Going all the way forward until all of the most

25  recently passed amendments, all amendments proposed in

52

1   modern history in fact have included legally operative

2   language in prefatory text.

3       The Court in the D.C. circuit in <u>Illinois vs. Ferriero</u>

4   really addressed this question head on.  Plaintiffs there

5   made the exact same argument.  The Court rejected it pretty

6   swiftly under the same reasoning.  It's -- there's no basis

7   to draw a distinction between the two.  The Court in <u>Dillon</u>

8   did not draw distinction between the two.  The D.C circuit

9   cited those cases and there would still be good law in

10  support of its position.  I understand we're on a Mandamus

11  standard there, but the same reasoning applies in this case,

12  your Honor.  It's pretty clear from the government's

13  perspective.

14      So as to the rescissions, your Honor, I don't think

15  that's a question the Court needs to reach.  The Court in

16  the D.C. circuit didn't end up needing to reach the question

17  when it considered the same issue.  But we would add that it

18  does provide a narrower hurdle for plaintiff's claims.  The

19  Court would not only have to find that the deadline was

20  invalid, but then also find that actions of five states

21  afterward are also invalid.  This would be a pretty

22  momentous step for the Court to take, and plaintiff doesn't

23  offer any precedent in his favor on any of these points.

24      And then lastly as -- the vacatur.  Plaintiff only asks

25  for relief as to himself in the complaint.  The complaint --

53

1  I believe it's paragraphs A, B, and C of the request for
2  relief, "Ask for vacatur only insofar as these regulations
3  impose legal obligations on the plaintiff," and then, "Ask
4  for a declaratory judgment and injunction only insofar as
5  regulations apply to plaintiff as well."  I don't think
6  based on what's in the complaint, we've got any grounds to
7  give any broader relief in this case.  But we don't contend
8  that any relief is warranted here, because as every Court to
9  have ever considered an ERA claim has found, it doesn't
10 provide the basis to state a claim.
11      Do you have any questions, your Honor?
12          THE COURT:  I do not.
13          MR. RISING:  Thank you very much.
14          THE COURT:  Thank you very much.
15      Mr. Valame, back to you.
16          MR. VALAME:  Okay.  So I guess the US first argues
17 that prefatory clauses are distinction without a difference,
18 which is very odd considering everyone agrees that what's in
19 the prefatory clauses is not part of the Constitution, and
20 the OLC has agreed that things that amend Article V that,
21 you know, we might think would be a prefatory clause if it
22 had legal effect must be in the content of amendments in
23 order to amend the effects of Article V.  So I don't think
24 the United States' position can be squared with the
25 constitutional reality that no one considers these clauses

54

1  part of the Constitution and that everyone agrees that some

2  things have to amend Article V.  I mean, the text of

3  amendments.

4      The lack of precedent, you know, again, this is the

5  first case that have presented the issue.  The government

6  can say there's no precedent, but that shouldn't factor very

7  heavily into the Court's analysis.  And I think especially

8  this Court should not rely on Illinois vs. Ferriero very

9  much in its decision.  The D.C. circuit I think was very,

10 very clear in every single piece of analysis that it did

11 that it was under the clear indisputable standard.  So, you

12 know, when the D.C. circuit says, "We reject the claim that

13 prefatory clauses and the texts are different," it says,

14 "Under the clear indisputable standard," "Under the clear

15 and indisputable standard."  So I think it would be, you

16 know, legal error for this Court to say -- to rely on the

17 D.C. circuit as persuasive authority in that area, because

18 the Mandamus standard is, again, sky high.

19     The Bill of Rights question really quick.  So the

20 argument made is that Congress said all or some of the

21 proposed amendments can be ratified.  That's -- A, it's not

22 divorced from the content of amendments.  All that Congress

23 is doing with that is saying one amendment ends here and the

24 next amendment starts here.  That's clearly Congress' power

25 to designate what the content of amendments is.  Congress

1  was saying, "We're not proposing one long amendment with 12

2  articles.  We're proposing one -- we're proposing 12

3  separate amendments."  And that isn't having any legal --

4  the operative effect in the same way that, you know, the US

5  says the Congress can nullify state ratification deadlines.

6  They don't bring up the 12th and 17th Amendments.

7       And then lastly, I would say, you know, the US says I'm

8  making this case a lot harder than it has to be because I'm

9  bringing up all these farfetched hypotheticals.  And I think

10  the question you should ask is, under the United States'

11  position, what stops these hypotheticals from happening?

12  You know, what standard would a Court apply to say Congress

13  can impose a seven-year deadline in order to make sure a

14  ratification is contemporaneous, but can't impose a deadline

15  or a requirement that, I don't know, the ratifying states

16  can't be gerrymandered?  The ratifying states have to

17  consider it at two legislative sessions.  Those all promote

18  consideration, deliberation, and national uniformity.  And

19  there's no sound reason to distinguish the deadline

20  analytically from all these things.

21       So, you know, the Court can't just say only deadlines

22  are valid to be generous.  It has to say Congress has a

23  broad power by bare majorities they can very deeply control

24  this amendment process that Article V expressly divide

25  between Congress and the states and doesn't give Congress

56

1 sole and plenary power over.

2      Last thing, vacatur in my complaint.  I did say vacate

3 the regulations insofar as they impose obligations on

4 plaintiffs.  But my understanding is that vacating a

5 regulation for one person vacates for everyone.  That was in

6 the statement of recent decision I gave to the Court with

7 Justice Kavanaugh's statement.  So, yes, you would apply --

8 you would vacate the regulation as applied to me, but you're

9 operating on the regulation itself with that remedy.  So the

10 regulation would just be gone for everyone.  And maybe I'll

11 take out the language in my amended complaint if your Honor

12 is okay with that.

13           THE COURT:  Very good.  All right.  Thank you for

14 your presentation.  And that is a good example of if you

15 were amending your complaint, that might be something that

16 you addressed.

17      All right.  I'll take the motion under submission with,

18 of course, the permission that I already granted there for

19 further briefing and potential amended complaint.  I'm not

20 compelling amended complaint.  If you chose to file amended

21 complaint, to present it by December 20th, and your feedback

22 on settlement process also by the same date, and I will not

23 be ruling until I have those further submissions.  So don't

24 be checking your mail every five minutes between now and

25 then.  And as to any of the procedural things that occur

57

after that, we'll have a chance to communicate.  So I think
that gives us next dates.  Thank you very much for your
presentations.

MR. VALAME:  Can I say one thing?

THE COURT:  Please.  Yeah.

MR. VALAME:  If you grant the government's motion,
I think you mentioned this at the opening, the individual
defendants -- I think the claims would clearly fail for the
same reasons that you grant the government's motion on.  And
if you grant the motion -- my motion for summary judgment,
then I would request -- I expect the government would
immediately appeal.  So those proceedings will be stayed.  I
just don't want to have the individual claims, like, kind of
hanging over everyone's head.

THE COURT:  I understand that you don't want them
hanging out there.  Everyone's -- you're enthusiastic to get
onto appeal, but we've got a few steps to get to before
then.  But, yes, I did note that in the briefs and in your
presentation that you're not hoping to have further
proceedings in this court after the rulings on the pending
motions.  But we'll see.

Thank you very much.  Have a great day.

MR. RISING:  Thank you, your Honor.

MR. VALAME: Thank you.

THE COURT:  We're in recess.

58

1        (Proceedings adjourned at 12:33 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

59

<u>CERTIFICATE OF TRANSCRIBER</u>


1
2
3    I certify that the foregoing is a true and correct
4 transcript, to the best of my ability, of the above pages of
5 the official electronic sound recording provided to me by
6 the U.S. District Court, Northern District of California, of
7 the proceedings taken on the date and time previously stated
8 in the above matter.
9    I further certify that I am neither counsel for,
10 related to, nor employed by any of the parties to the action
11 in which this hearing was taken; and, further, that I am not
12 financially nor otherwise interested in the outcome of the
13 action.
14
15
16
17          Echo Reporting, Inc., Transcriber
18                Monday, March 18, 2024
19
20
21
22
23
24
25